19-5357 Gerald Lee Farrell v. Michael R. Pompeo, Secretary of State, et al. Mr. Banas for the appellant, Mr. Martinez for the appellees. Good morning, Mr. Banas, whenever you're ready. Good morning, Your Honor, and may it please the Court. My name is Brad Banas, and I represent the appellant, Gerald Farrell, in this case. Congress is clear, Your Honors. A United States citizen loses nationality solely by the performance of an expatriating act. And whenever a consular officer has reason to believe that such an act has occurred, he shall prepare a certificate of loss of nationality and process the application. Before you get too deeply into the merits, could I ask you some questions about mootness? Absolutely. When the lawsuit began, your client had a very concrete interest in having the United States acknowledge the loss of citizenship in order to facilitate a transfer to the Swiss prison. He's now been released, and as I understand it, he's in Switzerland. So, does he still want this certificate, and what is his continuing concrete interest in getting it? Yes, Your Honor. Mr. Farrell does still want a certificate of loss of nationality. He wants a final administrative determination that he is no longer a citizen or owes any loyalty or allegiance to the United States. Given his criminal record here in the United States, that's not a small interest, as he wants to travel freely on his Swiss passport through Europe and through the rest of the world. Switzerland recognizes him as a Swiss citizen, correct? Yes, Your Honor. He has a Swiss passport. He's living there. He has a family there. He managed to live there for a decade with seemingly no interaction with the United States. Why can't he just go on with his life and not worry about some speculative future entanglement with our government? Well, Your Honor, a look at Mr. Farrell's history indicates it's not speculative. You are correct that he left the United States in the mid-'90s, and he acquired nationality as a Swiss citizen in 2004 upon his own application, and he did not use the benefit of his U.S. citizenship at all until 2013, I believe it was 2013, when he was traveling on his Swiss passport, again, with no use of his U.S. citizenship at all, when he was detained by the Spanish authorities and sent back to the United States against his will and called to account for actions he had done in the United States, and they treated him as a United States citizen throughout his detention. They refused to remove him. Sure, but that incident, the conviction, everything flowing from that crime is now done, and the Supreme Court has said very clearly the fact that someone has had a past interaction with law enforcement doesn't necessarily give them standing to seek forward-looking relief on the ground that they might have some future interaction with law enforcement. So the fact that he had a problem in the past doesn't persuade me that he's at imminent risk of future problems. Well, Your Honor, our position is he hasn't been a U.S. citizen since 2004, and the assumption that he was that led to all of that was incorrect, but more fundamentally, Your Honor, he's applied for certificate of lost nationality. He's been improperly rejected that, and regardless of his motivations or desires for that particular document, it has been improperly withheld from him. Is the injury to him that he has to satisfy the in-person requirement? Because when he was incarcerated in the United States, of course it would be an injury to have to – I mean, he was unable to leave the United States in order to sign such an affidavit. So if that was the basis of his injury, isn't that basis now moot, now that he's able to freely travel and sign the documentation in person? Your Honor, I believe the injury is the refusal to process his certificate of loss of nationality, period. But the refusal is based on the in-person requirement. That's correct. He hasn't been denied a certificate on the basis of the merits. He's been denied a certificate because he has failed to come in in person. And so that injury seems pretty palpable when you're incarcerated in the United States. However, is there an injury now that he can go in in person and sign such a document and then start the process of having a determination on the merits? Your Honor, the availability of his – his ability to go to a consulate, as this court described in Fox v. Clinton, is immaterial. And he's not required to do it by the statutes, the regulations, or the Foreign Affairs Manual. And given his past with U.S. government, he's not interested in going and stepping foot on U.S. soil, which is what a consulate is. And so I would suggest that that alternative option is completely immaterial under this court's precedent. Second, it's not required. And third, in current times, the consulates are closed for the Office of Overseas Citizen Services to do this because of the COVID pandemic. And, you know, again, I'll cite back to the Fox v. Clinton case. It was very clear the Department of State wanted Mr. Fox to come into a consulate and do a different procedure under 1481a-5 rather than what he'd already performed 1481a-1. And this court simply said you can't require him to do it. Congress has provided alternative routes for relinquishment of citizenship, and relinquishment occurs at the moment of the act done with a specific intent. And here I would suggest there's no question of fact of whether Mr. Farrell has lost his U.S. citizenship. He lost it in 2004. That cuts against you, though. That tells us he's already not a citizen. So now he just wants a piece of paper from the government confirming that. But on your theory, and it sounds factually correct, he is not a U.S. citizen at this moment, and he is a citizen of Switzerland, and he has all of the rights and duties associated with the latter. Your Honor, he has no proof that he's not a U.S. citizen. That's what a certificate of loss of nationality is. And why does that matter? It matters to him. He wants a finality. He wants an administratively final determination that the United States does not consider him a citizen. Right now that's up in the air. There's, to this day, a disagreement. Can you point me to some future, some consequence that might be reasonably likely? I mean, is he at risk of being drafted or being subject to some tax that applies to citizens abroad? What is the tangible harm to him? Yes, Your Honor. He could be subject to foreign asset reporting requirements. He could be subject to past taxation. He could be subject to a lot of things that U.S. citizens living abroad are subject to. And having that certificate of loss of nationality, while I understand Your Honor's concerns that it feels like a formality here, it is significantly important in his legal life as well as his practical life. I would agree with you 100% if you could point me to some substantial possibility of a future problem with the United States. Your Honor, I guess I was just— Being a little general about that. Your Honor, he applied for a certificate of loss of nationality, which is a benefit under United States law. He was denied that. That's his interest. His motivations for acquiring that or the potential legal applications or benefits of that are irrelevant to this analysis. The agency has arbitrarily denied a benefit he requested. This is like saying, sure, I know how to drive, but I don't have a driver's license and DMV won't give it to me. That's a problem. Well, also, isn't it a problem for your client? I mean, the government maintains in its brief that a person is still a U.S. national until a certificate of loss of nationality is issued. That's right, Your Honor. And while we are confident that Mr. Farrell has not been a citizen for over 15 years, it doesn't appear the government agrees with that. And so we need a final administrative determination from the Department of State so that he can go forward in his life confident of his severance of all ties to the United States. And this is the volitional allegiance, the volitional citizenship that our country was founded on. And he's seeking vindication of that right. And I should suggest who knows in the future what that could hold. We're seeing record numbers of people renouncing their citizenship because it does have impact for people living abroad. And I would just point out, in addition to this, what we're discussing is not a requirement in the statute. It's not a requirement in the regulation. It's not a requirement in the Foreign Affairs Manual. This is the agency's interpretation of a boilerplate attestation on the back of a form that is creating this in-person requirement. Mr. Bates, do you think that the Secretary has no statutory authority to impose such a requirement? I do not, Your Honor. You think they have no statutory authority? That's correct, Your Honor. Because? Your Honor, they do have statutory rulemaking authority. But if you look at the text of the statute and the structure of the statute, you see that Congress knew how to require in-person attendance at both a consulate as well as an immigration office here. If you look at 1481A5, you will see Congress requiring a U.S. citizen to appear in person at a consulate. That is not there for 1481A1, and it is not there under 8 U.S.C. 1501, which is the statute that talks about issuing a Certificate of Lost Nationality. The Secretary does have a great amount of discretion under 1104A to establish regulations, prescribe forms of reports, entries, etc., as deemed necessary. I mean, that's an incredibly broad grant of authority to the Secretary to kind of fill in the gaps. I agree. They have a broad grant of rulemaking authority. A broad grant of rulemaking authority? Of rulemaking authority, absolutely. Well, prescribe such forms of reports, entries in other papers, issue instructions, perform such other acts as deemed necessary. That seems to include both – yes, the Secretary could establish regulations, but could also do all of these other things as deemed necessary. Again, Your Honor, we don't dispute that they can issue forms, they can issue regulations, they can have sub-regulatory guidance in the Foreign Affairs Manual. But assuming the agency has authority to do this, it's arbitrary and capricious here because it violates their own regulations and their own sub-regulatory guidance in the Foreign Affairs Manual. If you look at the Foreign Affairs Manual – let's go directly to that. That's what the consular officers are applying in a situation where there's no question about the intent of the foreign national to relinquish their citizenship. That is the specific intent, the constitutional requirements that the government discusses in their brief at length. It tells the consular officers, be flexible in the interview.  And in fact, if you look at 12-7-FAM-1227, it has a note specifically if the applicant did not complete Form DS-4081, which is what is at issue here. And it says, reach out to them and get the form. It does not require an in-person requirement. There's no demand that they show up at a consulate abroad that they're applying to Mr. Farrell. Now, I would suggest that the consular officers have discretion to do that, but that takes us to the chain readout, Your Honor. And we look at these informal decisions, and there is no explanation. There is no suggestion in the letter decisions here that the agency has said, okay, Mr. Farrell, we understand your predicament. But for reasons A, B, and C, we're going to exercise our discretion to have you come into the consulate. They say, no, it's a requirement. They consider it a requirement. And considering it a requirement is turning a may into a must. And at heart, that is an arbitrary and capricious application of their own policies, regulations, as applied to Mr. Farrell. And for that reason, the letter decisions must be set aside. And again, I do think it's important to see where this in-person requirement is coming from. The government's kind of moved the goalposts from the pro se litigation in the district court to their response brief in front of this panel. And they have boiled it down to, in the record, I would point you to Joint Appendix page 212. It is the page two of the DS-4081. The only thing on there is the consular officers' attestation. This is the equivalent of a certificate of service that's attached to a brief. It's boilerplate language. And they're citing to two words, before me this day of and then month and a year. That is where they're coming up with this burdensome in-person abroad requirement. And it's not an interpretation of the statute, the regulation, or the foreign affairs manual, or the substantive portions of the forms. It's an interpretation of a boilerplate signature block. And creating a new eligibility criteria out of that, I would suggest is arbitrary and capricious. Again, as applied to my client. Why isn't the rule, why isn't an in-person requirement perfectly reasonable as a way of protecting U.S. nationals against loss of citizenship through flimsy process? A lot of this scheme responds to Supreme Court decisions which impose both substantive and procedural limits on the government's circumstances when a citizen can be denaturalized. So the trigger for this process is that any consular officer anywhere in the world has reason to believe that someone might have committed a denaturalizing act with the requisite intent. And if, can they really, can they really go forward on a reason to believe standard and issue this certificate without bringing in the person and saying, tell us what happened? Did you really intend to renounce your citizenship? Your Honor, I see I'm over my time. No, we'll let you continue. Thank you, Your Honor. A three-part answer. The first is demanding an in-person requirement would be, for all folks who relinquish under any of those provisions in 1481A, would be terrible policy. Because we're talking about 1481A1, but if you look at A3, we're talking about a U.S. citizen who is committing hostilities against the United States on a battlefield. To tie the agency's hands, to require that person to come in and sign something, it just defies the purpose of the statute and frankly makes no sense. So that would be my first point. And again, I'm not, this is not a policy case. I'm not arguing policy, but I do think it's important to see the full statutory paradigm. The second thing is, I think the agency in its regs and in its foreign affairs manual has done a reasonable interpretation. They can require it in their discretion, right? They can exercise discretion to have someone come in in a certain situation. Here, they violated their regulations and the FAM by demanding it to be a requirement. They did not consider it discretionary. They said, we can't process your application without you showing up in person. And so that's a legal mistake. That's interpreting a may as a must. But I agree that if this decision, and again, we're stuck with the four corners of the decision under the Cheney Redaction. If this was written differently and had different rationale and they said, look, we're going to exercise our discretion under the FAM to have you come in. Then, because we're concerned about your intent, because we're concerned about your voluntariness, this would be a very different case. And then the final thing I'll say is, Your Honor, again, the agency has backtracked a bit in its argument. And the only thing it's defending is not that this would be an in-person interview. They are arguing that they have to have this sign in person, an in-person signature requirement. While I agree an interview may be reflective of and interesting to ask questions about someone's voluntariness. A signature is not that, Your Honor. Literally, they're saying you show up at a window, sign this piece of paper. That's all it takes. So what they're defending is divorced from the rationale they argue at the beginning of their brief. And for those reasons, we would ask this court to reverse the agency's rejection of my client's certificate of loss of nationality application. So just one follow-up on what you said. Suppose I still think that a requirement for the citizen, the putative non-citizen, to show up in person and explain so that the secretary has a better sense of what happened. Suppose I think that makes sense in the abstract and doesn't make much sense on the facts of your case, given everything you've laid out. Why is it unlawfully arbitrary to just have a rule instead of a case-by-case assessment? Will we make this person come in but not that person? Rules can be over-inclusive, but if the rule is rational in the mind run of cases, we usually say that's not arbitrary and capricious. Your Honor, if the agency had actually implemented or promulgated a rule this way, this would be a different case. But they haven't. They haven't put it. It's not in the statute. It's not in the regs. It's not in the FAM. The rules that we look to in the regs and in the FAM indicate discretion to require an in-person interview, not mandatory. And so I do think we are asking for a very narrow holding here, Your Honor. We're not asking to overturn the apple cart. Mr. Farrell falls into a subset of relinquishing U.S. citizens, right? He is saying that 16 years ago, I had a specific intent and voluntarily took Swiss citizenship and got rid of my U.S. citizenship. And so the question of voluntariness today, it's a question of voluntariness 16 years ago. And so that was my first point. But to your point, Your Honor, and I apologize for not answering the exact question, the agency does have discretion to use rulemaking or adjudication, right? But this is an informal adjudication. This is not how you announce a rule. This would be entitled to no deference under Kaiser, and this is not an affirmative statement of policy. This is a one-off adjudication that frankly violated their own regs and FAM. And this court doesn't go any further than that. Yeah, I mean, it's just a little odd, right? The fact of this case that makes your position so appealing was, you know, the guy stuck in a U.S. prison and the government saying we won't acknowledge what everyone knows to be true until you can drop by our embassy in Switzerland. And that just sounds Kafkaesque. Now we'd be doing a Chenery remand for the agency to re-explain in circumstances where that constraint no longer applies, and presumably going forward they can say, well, okay, we might make exceptions for people in prison, but your client's not in prison. It's perfectly easy for him to come into the consulate and dot a few I's and cross a few T's so we keep our paperwork in order. And, Your Honor, I do understand. I understand that the case has changed a little bit now that Mr. Farrell has removed himself from the United States. I think we would use the term self-deport, right? But at heart, this is a case just like any other administrative law case. He's applied for a benefit from a federal agency. He has an interest in acquiring that benefit. He's eligible for it, and the agency has arbitrarily and capriciously rejected it. The fact that he's in Switzerland does not undermine his request, and he has good reasons to not step foot on U.S. soil, which is what a consulate is. And so while I understand the interests might have changed a little bit, the interests are still there. This case is not moved, and the agency cannot, should not be able to get away with requiring an unlawful requirement simply because he's now in Switzerland. This court made it clear in Fox v. Clinton describing the State Department's position as nonsensical and saying it's immaterial to... Can I just ask you to explain why you think a certificate of loss of nationality is a benefit for the person seeking to relinquish citizenship? Because I think there are a number of aspects of the statute that suggest the CLN is really an administrative determination for the government, right? The secretary makes the determination, and if they agree to the certificate, a copy is sent, you know, to the person who has lost their nationality, right? It's not really... The statute is not really phrased in terms of a benefit for the expatriating citizen as opposed to kind of almost like a housekeeping measure so that the government knows who is a citizen and who is not a citizen. So I'm wondering if you can clarify that, because you said it was a benefit for Mr. Farrell. That's right, Your Honor. All of the statutory provisions we're talking about are in the Immigration and Nationality Act. In the Immigration and Nationality definitions, it defines applications as benefits applications, benefits petitions. And so petitioning for something under the Immigration and Nationality Act, we would call it benefits determination. I would also note that this is a case where he has filled out, my client has filled out the necessary applications and applied for a certificate of loss of nationality. And I understand the point that, and I think this is probably the tension between our positions and the entire case. For most of the 20th century, this was done affirmatively by the State Department against the will, right, of U.S. citizens. Well, when a fro-yum came out, and that kind of changed things, right, and we see the administrative presumptions changing in the mid-90s, and we see more of U.S. citizens affirmatively asking for certificates of nationality rather than the State Department simply issuing them. And so I understand that tension, Your Honor, but I don't think that changed the fact that, again, there is a process set up for this. We see it in the regulations, fill out this form, fill out this form, and you can have this final administrative determination. And that final administrative determination means a lot to my client at this point. How much of your mootness defense, if I can ask, depends on your client's fear of going to an American embassy or an American consulate because he's worried about being extradited for another crime? None of it, Your Honor. I think that our case is not moot because he applied for a benefit, and that benefit has still been rejected arbitrarily and capriciously. And I guess I add the facts to add atmospherics. And again, I guess I keep going back to Fox v. Clinton because that was this Court's most recent discussion on this exact issue we're talking about. And in Fox v. Clinton, the Court said, look, there are other options for him to acquire a CLN. And in that case, Dr. Fox was out of the country the entire time. He was in Israel. He could have gone to the consulate in Tel Aviv, but he didn't want to, and he didn't have to. And this Court affirmed that and again described it as, quote, immaterial. And so I do think this panel should give deference to that case. And again, I think this is just the next evolution of that case law, frankly. So just as a practical matter, he would, I know you said maybe the consular services office is closed, but it would seem that it's a pretty easy thing as a general matter for the expat to drop by the office and sign the form. And he would, you know, he has the keys to his own non-recognition in his pocket, it would seem. And yet he would rather wait. Now, let's say it takes us six months or nine months or something to write an opinion. He would rather wait for that than just go to the embassy and sign the form and be done with it. Yes, Your Honor, and I understand that may seem absurd from where you're sitting, but this has been a long fight for him. You know, this has kept him, it kept him detained longer. In the U.S., he wants vindication that the State Department should process his certificate of lawful nationality because he has fulfilled all the eligibility criteria. And these informal letter decisions have raised a wall through bureaucratic processes and created significant red tape that is unlawful. And he has a very serious interest in seeing that right vindicated. And again, but at heart, he applied for benefit. It was improperly denied. And he should have that choice to wait six months or go to the consulate, and he's choosing to wait. Okay. Judge Rao, anything else? Judge Walker? Okay, thank you. We'll give you some time on rebuttal. Thank you, Your Honor. Mr. Martinez. Good morning, Your Honors. It's pretty apparent there's some interest in mootness, so why don't you begin there? Sure, Your Honor. May it please the Court. We believe that the question of mootness, it is important to realize, as the Court has done, that Mr. Farrell no longer has an impediment to go into an embassy or a consulate abroad and obtain the benefit, not the benefit, excuse me, the administrative recognition document that he seeks. This is about that. And as Your Honor recognized earlier, he has the keys to do that and does not have to wait for this Court to act. Do you have any knowledge of the situation on the ground in Switzerland? Is it the case that all these offices are now closed due to COVID? I'm not aware, Your Honor, whether they're open for particular services or not, but it would apply all over the world. And for all people seeking not only CLNs but all other documents or benefits or any sort of, I guess, document that would be processed through consular processing in an embassy. Mr. Martinez, let's assume that they're closed to the public. What is he supposed to do? He would have to wait like everybody else, Your Honor, during this situation. There are presumably thousands of people waiting to do transactions with a U.S. embassy or consulate that are waiting because of the situation, and not only abroad, but also within our country here. I think that this case is not one about mootness, and it's one about, as the Court recognized minutes ago, the INA granted the Secretary an express delegation of authority for the determination of the nation. Is the government's position that the case is moot or is not? The government does not support the position that the case is moot, Your Honor. The government rejected Mr. Farrell's application or request for a certificate of loss of nationality, and that stands. The government does agree with Your Honor that Mr. Farrell has the keys to solve that situation and could moot his case if he decided to go into a U.S. embassy, and he no longer has that impediment. What is his continuing interest, concrete, tangible Article III interest in getting the certificate at this point? A certificate of loss of nationality, Your Honor, under Section 1501 is an administrative determination of loss of citizenship, and presumably Mr. Farrell, that's what he wants. He wants a certificate of loss of nationality, and the government has not even adjudicated his request on the merits. Is the government's position, as of today, right now, is Farrell a citizen or not? We do not know, Your Honor. The government has not adjudicated his request on the merits yet. It's incorrect for Mr. Farrell to say that he's no longer a citizen. We do not acknowledge that, and I think it's important to recognize that these are two separate issues that should not be conflated. Assume that when he became a Swiss citizen, he had the requisite intent to relinquish under 1481. Just assume that in the hypothetical. Is he a citizen today? We don't know, Your Honor. Assuming that he did, there would still be an assessment required under the statute by the consular officers, but that's not what this case is about. Mr. Martinez, what would it assess? It would assess whether the act, whether Mr. Farrell is voluntarily seeking to give up his citizenship and had the intent when he acquires his citizenship to give up his citizenship. Assume both of those things. What else would it assess? Well, assuming that a consular officer has made that determination, then this consular officer would process a recommendation in a package for the Secretary of State to issue a Certificate of Loss of Nationality, which is separate from the issue of loss and should not be conflated. I'm still having trouble. Assume Judge Cassis' hypothetical with the voluntariness element added. So Mr. Farrell voluntarily intended to relinquish his citizenship in 2004 when he became a Swiss citizen. If we assume that, then today, is he a U.S. citizen? Perhaps, but not in the eyes of the government, Your Honor. Mr. Martinez, I mean, it's not, I mean, in your brief, you say that until a certificate issues, a person remains a U.S. national. That's the government's position in its brief. Are you saying that's not your position any longer, that it's, that there's like a maybe he's a citizen category? Well, in our brief, Your Honor, I think that we intended to say that he remains a U.S. national in the eyes of the government. And that is something that the district court disagreed with, but that issue is not on appeal. What is on appeal is whether the secretary has the discretion to require an in-person appearance to obtain a Certificate of Loss of Nationality. Not a determination of whether loss occurred or not, or when did that happen, has it happened or not. This issue is about Mr. Farrell wanting a Certificate of Loss of Nationality. And the Secretary of State having a broad discretion to set forth procedures and forms that govern the process to obtain that Certificate of Loss of Nationality. Well, I do think some of these questions, though, go to standing and some of the other underlying questions. I mean, so, you know, in the hypothetical, my colleague said, right, you have an intentional voluntary relinquishment. At that moment, the statute seems to suggest you're no longer a citizen. But the government's position seems to be that they will continue to think you are U.S. national until a certificate issues. Right, Your Honor, because the Certificate of Loss of Nationality will issue after an assessment of whether there is an intent and voluntariness. And that has not happened. So these are two different things that are going on right now. But for the purpose of this appeal, we're not talking about whether loss has occurred or not. We're talking about what is required to process a Certificate of Loss of Nationality that will determine whether that loss has occurred or not. It's a very peculiar situation, right, because the statute seems to suggest he lost his citizenship, say, in 2004, if we assume it was voluntary and intentional. But then if there were to be a certificate issued, but the government continues to treat him right now as a U.S. citizen or a U.S. national. But if they were to issue a certificate today, that certificate would say that he lost his citizenship in 2004. So for a period of 16 years, he would both be a citizen and not a citizen. It's a very peculiar circumstance. Well, Your Honor, Your Honor is correct. The Certificate of Loss of Nationality would include the date of the expatriating act as a moment that the individual lost citizenship. But that is inconsequential and that is not an issue, I believe, respectfully, that the court needs to determine to decide whether the secretary can impose an in-person requirement for the processing of a Certificate of Loss of Nationality. Perhaps an individual, in his or her view, had that intent and had that voluntariness, but the government does not know it until they go through the procedures to issue a Certificate of Loss of Nationality. This is particularly important in a situation where, for example, Mr. Farrell is saying, all that I need to do is write a piece of paper and send it to the embassy that says, I became a Swiss citizen in 2004 and I do not want to be a U.S. citizen anymore. That is illogical. There's no way for the government to make sure that that is correct. And it is illogical as applied to the facts of this case where he waited 12 years to seek that Certificate of Loss of Nationality. So that's why the government in this situation and in all other situations has to assess voluntariness and intent. And the procedure to do so includes an in-person appearance requirement. Voluntariness and intent as of when? As of 2004 or as of when he comes in for the interview? Voluntariness is overall, Your Honor. Does he right now want to give up his U.S. citizenship? And intent is, did he have an intent to give up U.S. citizenship when he committed the allegedly expatriating act? Why does his intent now matter? 1481A seems very clear. There are two mens rea elements. You have to do the expatriating act with, and there are two mental elements. One is that the act has to be voluntary. And another is that the act has to be done with an intent to relinquish. But both of those mental elements attach to the expatriating act. And 1481 seems very clear on that point. Yes, Your Honor. But I think this goes to the merit of whether an individual lost citizenship or not. Just assume we think, assume we're interested in that question for whatever reason. I mean, isn't it still the case that he lost, on his allegations, he lost his citizenship in 2004, regardless of how you adjudicate CLNs or anything else? On his allegations alone? Yes, Your Honor. But it is important to recognize that the government has not acknowledged it, because what this case is about is the administrative issuance of that acknowledgement, the Certificate of Loss of Nationality, and whether the secretary has discretion to require an in-person appearance. And we respectfully submit that the statutory framework gives the secretary, as Judge Rao recognized earlier, broad discretion to prescribe forms that include that. And it serves important purposes in this case when we have issues of voluntariness and intent involved. For one, it allows a comprehensive assessment of that voluntariness and intent. Second, it ensures that an individual understands the irrevocable nature of expatriation. We're not talking about obtaining a right or giving up some sort of document. We're talking about U.S. citizenship. And U.S. citizenship is invaluable. The Supreme Court has even recognized and described it as the highest hope of civilized men. Given such the important issue at stake, an in-person appearance makes sense. It allows for consular officers to determine whether someone really wants to give it up. You look at the demeanor, you look at someone's state of mind. Mr. Martinez, if I might interrupt, do you think that there are some benefits that come with obtaining a Certificate of Loss of Citizenship? I believe there will be the benefit that Mr. Farrell recognized earlier, that he assured that the government does not see him as a U.S. citizen anymore. But whatever benefit an individual obtains from that is subjective. Is it subjective, Rao? I mean, do you think, could he not now be subject to taxes or, you know, other IRS requirements, reporting requirements? Yes, Your Honor, he might be subject to that. I cannot speak at length about all the specific things that an individual loses or does not have to do when they give up U.S. citizenship. But I presume that that's one of the reasons why Mr. Farrell wants a Certificate of Loss of Nationality. But he has not complied with a reasonable requirement that the Secretary has discretion to impose. And until he does, a Certificate of Loss of Nationality cannot issue because the statute is clear, 1501 is clear, that the issuance of a CLN is subject to the Secretary's approval. I really do want to highlight a fallacy in Mr. Farrell's argument here, and that is his reliance on the 2009 Fox case. Fox is an opposite because it did not involve a situation in which this court addressed a procedural requirement and whether that imposed an impermissible burden. Fox involved the denial of a CLN on the merits. There was an Israeli citizen that wanted to give up, and the Department of State denied that because it was a question of whether he had automatically acquired Israeli citizenship or he had applied for it. But more importantly, the court cannot extract much, or if anything, from Fox because in 2009, the forms that contained the in-person appearance requirement right now were not operative. Form 4079 became operative in 2013, and Form 4081 became operative in 2015. So the court cannot extract much from the Fox case. But I think that what is fatal to Mr. Farrell's position is that not once does he mention or analyze Section 1104 and the express grant of authority that it gives the Secretary of State to set forth procedures, forms, anything for the determination of nationality and the issuance of a CLN and managing consular officers. Mr. Martinez, go ahead with the finally. No, I'm sorry, Your Honor. I just wanted to make the point also that it is very important to highlight that Mr. Farrell is confusing the requirement that he's challenging on appeal. He repeatedly references that the FAM and any other documents, even the forms, do not require an interview, that the interview is optional. But the interview is a separate matter. An interview, if you look, it's contained in our addendum on page 102, and yes, that interview can be done as a matter of discretion by phone or email, etc. But the forms itself require an in-person appearance requirement to sign. Many of his arguments challenge the interview, but not the signing of the forms. I mean, in Form 4079 even says that the purpose is to determine whether the individual performed a potentially expatriating act voluntarily and with intention to relinquish. And it says in page 144 of our addendum, please sign before a consular officer. Similarly, Form 4081, unlike Mr. Farrell's representation, in page 47 of our addendum, it says the applicant appeared personally before me and signed the statement before me. There is no question that these forms require that. There is no question that the Secretary has the authority to prescribe this form, and there's no question that the statute requires this broad authority. As I mentioned, I want to reiterate that United States citizenship is invaluable. In-person appearance requirements are important purposes to assess voluntariness and intent. Can I ask you... Your Honor, I think I missed the question. Yeah, I'm sorry. You're cutting in and out a little bit. Take the enemy combatant hypothetical that your friend posed to us. So suppose there's a U.S. citizen who takes up arms against this country, which is an expatriating act. And unfortunately, we have seen some of those. And suppose that person actually does a recruiting video, propaganda recruiting video for the enemy, right? And it makes its way into the State Department, and they see the guy on the battlefield, and they see the video in which he's saying how much he hates America and how proud he is of himself for throwing away his horrible association with the country. Is it the government's position that it will continue to recognize that person unless and until he comes in and gets Mirandized and signs some form? Your Honor, I think that in that hypothetical, we might be dealing with a different expatriating act that may or may not include an in-person appearance requirement for an embassy. What we're working here right now is taking up foreign citizenship. We're not considering whether there is a foreign combatant or a terrorist or anything of that nature. And the statute specifically allows for people to commit treason to the United States an avenue for expatriation, but that is within the purview of the Department of Homeland Security. It's not an issue here. So I'm sorry, just walk me through the mechanics. The requirement to appear in person and be forewarned and sign the form applies only to expatriating acts under 1481A1 as opposed to the other expatriating acts in the 1481A list? No, Your Honor. I'm not saying that it applies only to 1481A1, but the other expatriating acts, most of them include an in-person appearance requirement as a condition for the expatriating act itself. Here, 1481A1 does not include an in-person appearance requirement for the expatriating act itself, but does include it for the processing of a CLN. And that's what this case is about. That issue of whether when somebody seeks to renounce citizenship under 1481A1, can the department, is it proper and reasonable for the Secretary of State to require an in-person appearance to assess voluntariness and intent? And it is reasonable. It serves important purposes. It's rationally related to the statute and to the context and purpose of it. One more question. Go ahead, Naomi. Let me ask you a question I also asked, Mr. Vanius. Do you think getting a CLN is a benefit for the expatriating individual? Or, I mean, is a CLN for the benefit of the individual? Does the State Department view it as something that's purely internal to the government? Do you agree with the characterization of this as a benefit? I don't agree with the characterization of it as a benefit and whatever requirements comes when something is a benefit. This is an administrative recognition of a laws that could have occurred if the department determines that it did. Whatever the applicant does to when they receive it is up to them. But here we're talking about an administrative process and administrative recognition from the government. Mr. Martinez, if it's not a benefit to the applicant, why do you charge the applicant more than $2,000? I'm not sure, Your Honor. That is in the regulation. And, of course, the government charges fees for different things as part of consular processes to support that. I don't think it's tied to the fact of whether it is a benefit or not. I mean, they usually charge fees for things that are a benefit to the person paying the fee. Otherwise, no rational person would pay the fee. But let me ask you one hypothetical. You described Mr. Farrell as someone who just sent in one letter and now wants us to assume that's enough to demonstrate that his 2004 relinquishment was intentional and voluntary. I'm not sure I'm on board with you in terms of your description of the facts and all the evidence that he put in front of the State Department. But I do agree with you that it is the responsibility of the State Department to assess whether what he did in 2004 was intentional and voluntary. Now, how does the State Department assess that? Well, the statute doesn't say they assess it in person. The regs don't say they assess it in person. The manual doesn't say they assess it in person. Instead, there is a form that arguably, and I think probably does, say the signature has to be in person. And so our question, I think, is, is that arbitrary and capricious? Is that reasonable for whoever wrote that form to say the signature always has to be in person? Or put another way, whoever assesses that form after it's been submitted by Mr. Farrell, when they assess it, is it arbitrary and capricious for them to say in this particular case, there must be an in-person signature? And it's only not arbitrary and capricious if the absence of the signature sufficiently informs the assessment of whether what happened in 2004 was voluntary and intentional. So my hypothetical is, imagine I'm running a computer coding shop. And it's very important for everyone I hire to follow directions. And so I give them a test during their job interview. And I give them directions and I see how well they follow them. I give them the directions by telling them the directions by speaking. It's a verbal direction. And this particular job applicant is deaf. Now, he didn't follow the directions. I could have written the directions for him. He would have probably followed them if I had written them, but I spoke to him. He didn't follow them. I don't hire them because I made an assessment that he can't follow directions. Do you think that that assessment is reasonable? It's not reasonable, Your Honor, but I don't know that it is comparable. You see the analogy here? There may be many instances where an in-person signature is what the department needs in order to assess accurately. But there may be, if it's not here, in some other instance, at least one imaginable applicant where the evidence of voluntariness and intent is so overwhelming that you don't need the signature in order to make an accurate assessment that the relinquishment 16 years ago was voluntary and intentional. Don't you think that's at least imaginable that there would be that situation, even if it's not this situation? Perhaps, Your Honor, but I think it is important to realize that… If perhaps is the answer, then doesn't that mean that you can't have a blanket rule that every single applicant must, no matter what, provide an in-person signature? And that is, as you said, the informal rule that you have. Well, a couple points to respond to, Your Honor. I think it is black-letter administrative law that the agency's act or solution does not have to be the best one. And to get into hypotheticals of whether there could be one or many… It has to be not arbitrary and capricious. Yes, Your Honor. Of course, but it would be substituting the court's judgment for that of the agency. And what we have in front of us, it's a requirement. And the question here is whether that requirement is reasonable. And I think that the forms is not only about a signature, Your Honor. There is an interaction between the consular officer as part of that signature. And this is clear not only in the forms themselves, but in the manual. But you just said it doesn't have to be in person, correct? All the other interactions don't have to be in person, according to your rules, correct? Those are only to develop the case, Your Honor, to see if the case moves forward. But to actually assess an intent and voluntariness of expatriating, those have to be in person. Those are not only in the forms, they are in the manual in several instances. In pages 112, 121, and 105 of our addendum, we include the different instances in which the matter says a consular officer must assess the demeanor, the state of mind, whether they have a pushy spouse or a pushy parent that is obligating them to renounce citizenship. But Mr. Martinez, that's renunciation, I think. We're talking about relinquishment. And the inquiry in terms of when is it voluntary and intentional is different from renunciation. That inquiry is in the moment. The inquiry for relinquishment, I may have missaid it, but for renunciation is in the moment, relinquishment is in the past. And I really did think that you said a few minutes ago that everything for a relinquishment inquiry can be done by video or by phone, except the signature. No, Your Honor. I believe so. If I did, I apologize. I did not represent that. What I represent is that an interview to develop the case could be done by phone or by email when a consular officer is getting the preliminary information to determine which forms to send to the applicant. Is it a relinquishment based on attaining foreign citizenship? Does the applicant want to come in and actually sign a note based on 1481A5, for example? But for relinquishment upon attaining citizenship in another country, that assessment is the same, whether it is renunciation or relinquishment. A consular officer is tasked with determining voluntariness and intent, and it is an equal determination, and whether you have a pushy spouse, whether there is duress, whether there is intoxication, a lack of state of mind will apply equally. And that's why we have an in-person appearance requirement to make sure that that person really wants to give up U.S. citizenship and is not being forced to do so, and they really wanted to do it back then when they allegedly committed the expatriating act. That requirement is not only in the forms, it's in the manual. And though the statute may not say it explicitly, the statute gives an express broad delegation of authority for the Secretary of State as he deems necessary to set it forth. The in-person part of what you just described, and I think I maybe was confused based on my misunderstanding of one of your earlier answers, but there's an initial interview that doesn't have to be in person, and then at some point, the applicant has to show up in person, and during that time, the applicant has to sign the form. Is there anything else the applicant has to do, always has to do, in person besides sign the form? Your Honor, in addition to signing the form, an applicant reads or has read all of the irrevocable consequences that follow from the loss of U.S. citizenship, and they have to confirm their understanding of that. In addition to that, in person, they would meet with a consular officer that would have a back and forth, and then submit any additional requirements such as original documents, any U.S. passport, the fee, and that's what would happen in person. That's why it's very important for somebody to appear, and this is not the only instance that the Department of State requires an in-person appearance. For example, children of U.S. citizens born abroad, at least one parent have to appear in the embassy to complete the process. Imagine a situation where they say, well, I have a kid abroad, and the department has determined that in that situation, an in-person appearance is reasonable as well, and an in-person appearance in this case is reasonable, too, because we're not only talking about obtaining U.S. citizenship. In fact, at stake here is even higher, giving up U.S. citizenship. It's important. We want to make sure that it's done right. We want to make sure that it's voluntary because we don't want an applicant to later come back and say it was not my intention to give up U.S. citizenship. I was intoxicated. I was pressured. There was somebody in the other room that you couldn't see when I was in the video with you or on the phone. Things of that nature, those can only be confirmed in person, and that's why it's important, and that's why repeatedly the manual, not only the forms, repeatedly the manual in the instances that I mentioned earlier and others in our brief set forth that an in-person interaction is crucial for this determination. Once a CLN issues, suppose it issues and the person denaturalized wants to contest the denaturalization. What are the legal options for doing that? It seems like under 1503, there's a clear option to do that if the denaturalized person is in the country, but I couldn't figure out what options, if any, someone like Mr. Farrell would have if the person is outside the country when the CLN issues. Yes, Your Honor. Section 1503 has two subsections. 1503A is for people located in the United States, and 1503B is for people located outside of the United States that can file an action in district court. But I think that the reference of 1501 to 1503 and Mr. Farrell's reliance on that is unavailing because it does not mean that the Secretary cannot impose a requirement to sign the forms in person abroad. Just walk me through. The proceeding under 1501A is to bring a court action for a judgment declaring the person to be a U.S. national. Okay, so that seems clean and clear. But 1501B, the option made available is an administrative appeal to get something that's called a certificate of identity, but that doesn't restore citizenship or get you before a judge to argue for restoring citizenship. It just lets you come to the U.S. and seek admission as an alien. I don't know, Your Honor, that this situation even arises because of the irrevocable nature of the CLN. And I'm not sure that I'm following Your Honor's question in regards to how does it pertain to the Secretary's discretion to issue a CLN here. In our brief, in pages 47 and 48, we actually explain and support examples of how an individual who has obtained a CLN can challenge that. And there's different cases in the circuit court here. Where is it, 47 to 48? 47 and 48, Your Honor. Yeah, the reason I think it might matter is it might bear on a question that Judge Rao was asking you about, which is, do we think of the CLN process as fundamentally a due process protection for the person who's about to be denaturalized to make sure that his rights are protected? Or do we think of the CLN process as an investigatory process for the government, more the way it was probably used in the 50s to denaturalize against the will of a person? And I'm just speaking for myself, but my degree of interest in how much protection is built into the CLN process might vary up or down depending on whether the denaturalized person has another judicial or other avenue for challenging the CLN after the fact. That's why I'm asking. I don't think that that is an issue that the court needs to determine to decide this appeal, Your Honor, because whether there is a due process protection, whether there is a constitutional right involved here is not a question on appeal. The district court did not even decide it, and neither party appealed it. In fact, Mr. Farrell did not even raise argument on it in his opening brief. I mean, if I think that the in-person requirement is hard to justify as a bright line rule under the statutory scheme but makes some intuitive sense as a due process matter, then it might matter whether the CLN process is more investigatory or more protective. I respectfully disagree, Your Honor. I think that in the context of the Administrative Procedure Act here and the claims that remain on appeal, it's whether it's arbitrary and capricious, not whether there is involved or imposes any impermissible burden under due process. That's not a question for the court. What I do think is that the question is narrow and whether that requirement is reasonable. In the several cases that we raised in our brief, all of them involve broad delegations of authority to different departments. In fact, we're more limited than now. And this court, the framework and the analysis that this court applied is whether it is reasonable. And how is it reasonable is if it's arbitrary and capricious. And how is it arbitrary and capricious? Well, you make a determination if it is consistent with the context and related to the purpose of it. And we respectfully submit that it is. Judge Rao, any other questions? Judge Walker? Okay, thank you, Mr. Martinez. Thank you, Your Honor. Mr. Branis, we'll give you two minutes. Thank you, Your Honor. Just three very short points. Judge Walker, a signature on a form in 2020 is wholly unrelated to Mr. Farrell's voluntariness and intent in 2004. And I think that is the crux of our arbitrary and capricious argument. I'm unclear now on what requirement the government is actually saying it relied on to deny or reject my client's application. On page 50 of their brief, they limit it from an in-person interview, an in-person appearance, to just an in-person signature. And so this discussion about we don't – I'm unclear. But I do think, at heart, going to – I think you put it very clearly, kind of nothing in the statute, nothing in the regulation, nothing in the FAM. It's this one piece of paper that requires a signature. I think it's extremely important to note that a signature today, walking in and signing something, has no value to determining Mr. Farrell's intent in 2004. And Judge Katsas, following that point, the rest of the regulations indicate what happens after they process a CLN. And it's in 1501. The Secretary of State sends it on to the Attorney General, the Commissioner of the IRS, and I believe the Department of Homeland Security. And they all get a chance to look at it and see if there are any additional complications or issues that need to be addressed before they'll issue the CLN. The government has just now confirmed and doubled down on the fact they still think my client's a U.S. citizen. And so acquiring that proof, that final determination that he is no longer a citizen, and the Attorney General, the IRS, DHS do not think him a citizen, presents a very ongoing non-moot case. And it got brought up that once he receives a CLN – this might sound dramatic, but Mr. Farrell can't be accused of treason. He can't be accused of violating the Foreign Asset Reporting Requirement. He can't be held for any more taxes after that issue. So I do think it's a very real case. And if I may just conclude, I see my time is up, and I know Arjun's gone on quite a while. Go ahead. We agree that U.S. citizenship is a valuable benefit. And the reason it's valuable is that the founders determined that it was volitional. And that it was a part of the Department of Homeland Security because citizenship is a choice. And recognizing that it is a significant benefit is also recognizing that Mr. Farrell has the right to choose not to be a citizen. And that is an extremely important part of the valuable right of citizenship. And what we see here is the prior administration putting up red tape to tear away and deprive someone of that aspect of U.S. citizenship. It makes it so valuable, not through notice-and-comment rulemaking, not even through sub-regulatory guidance, but interpreting a signature block on a form that's issued. And for those reasons, we would ask this court to reverse the lower court's decision on this and enter an order ordering the Department of State to process Mr. Farrell's CLN application. Thank you, Your Honor. Thank you, Mr. Branis. The case is submitted.
judges: Katsas, Rao, Walker